BLANCHE, Judge.
This is an appeal by plaintiff from the judgment of the trial court dismissing his suit for workmen’s compensation benefits. We affirm.
The trial judge rendered Written Reasons for Judgment summarizing his findings of fact and conclusions drawn therefrom as follows:
“On August 6, 1969, the plaintiff while employed at Schuylkill Products, Inc., the defendant herein, passed out and fell about four feet to the floor. Prior to the accident plaintiff had an excellent work record. Plaintiff woke up in the hospital and stayed there for several days. He returned to work on August 18, 1969 and continued his employment with defendant until September 5, 1969.
*774 “Dr. James Lorio was plaintiff’s treating physician and the company doctor. He saw plaintiff at the emergency room of the Our Lady of Lake Hospital on August 6, 1969. At that time he made the following diagnosis : heat exhaustion, abdominal cramps and contusion of scalp and left elbow. He was discharged from the hospital on August 8, 1969. During his initial hospital stay plaintiff never complained of back pain. On August 11 and August 13 plaintiff was seen by Dr. Lorio in his office. On the 13th plaintiff told Dr. Lorio he had regained his strength and Dr. Lorio approved his return to work as of the 18th of August. Dr. Lorio next saw the plaintiff on September 6, 1969 at the emergency room at the Our Lady of Lake Hospital where the plaintiff was complaining of pain in the right lower abdomen. He remained in the hospital until September 12, 1969. The diagnosis at that time was swollen inguinal lymph glands. On September 23 and October 4, plaintiff was seen in Dr. Lorio’s office and Dr. Lorio found no limitation of motion anywhere in the body and felt that plaintiff moved well in all directions and that he could go back to work. On September 13, plaintiff was seen in the emergency room complaining of pain in the scrotum radiating into the right side. On September 20, 1969 at 1:20 A.M. he complained of a backache to the nurse. He was discharged from the hospital on September 21. He was finally seen by Dr. Lorio on October 13, 1969 at the Baton Rouge General Hospital at which time a diagnosis of a possible back strain and possible malingerer was made by Dr. Lorio.
“Plaintiff was seen by many physicians and the court will briefly summarize the gist of their testimony. On May 19, 1970 plaintiff was examined by Dr. Charles Cracraft, an orthopedic surgeon. Plaintiff gave Dr. Cracraft a history of fainting and falling backwards on the job. He complained of pain in the entire right side. He carried a stick to aid or assist him in walking which Dr. Cracraft said was too short. Dr. Cracraft also thought it was significant that he would not bend more than 50'% either on flexion or extension. Dr. Cracraft’s diagnosis was strain of back by history and exaggeration of symptoms. Dr. Cracraft saw plaintiff on December 1, 1970. His impressions at that time were identical to his initial impressions.
“Plaintiff was seen by William L. Fisher, a neurosurgeon, on March 13, 1970. Dr. Fisher felt that there was nothing objectively wrong with the patient at that time and underlined the bizarre symptoms and responses that plaintiff gave to him while under examination.
“Charlie Leslie, a radiologist for the Earl K. Long Charity Hospital, interpreted a myelogram which was performed at the hospital on October 16, 1970. • His impression was that there was a defect on the right side at the L-4 and L-5 level. On cross-examination he admitted there was a bilateral defect on the left side at the same level. The x-rays which Dr. Leslie interpreted and introduced in evidence were shown to Dr. Fisher. Dr. Fisher felt that it was a poorly done study and felt that he could draw no conclusion from the pictures at all because the puncture should have been made at the L-3 level rather than at the h-4 level. In this connection Dean Ge-heber, a prominent radiologist of longstanding in the Baton Rouge community, also interpreted the x-rays taken by Dr. Leslie and saw nothing that he could label as a fixed abnormality.
“The only other medical evidence was the deposition of Dr. G. Gernon Brown, Jr., that was introduced in lieu of his testimony. Dr. Brown’s deposition taken as a whole is not significant in the court’s opinion one way or the other.
“From the medical testimony which has been introduced and given in this court it is impossible to hold that plaintiff has sustained the burden of proof necessary *775 to show a connection between his fall on August 6, 1969 and his alleged back trouble which did not manifest itself until many, many months later. In this connection the testimony of Dr. Lorio is very significant. The court places great weight on Dr. Lorio’s testimony. He was the treating physician; had known plaintiff prior to the accident when he gave him a pre-employment physical; treated him for his original injury on August 6, 1969 and saw him through October 13, 1969. At no time, with one exception when he was in the hospital early in the morning of September 20, did plaintiff ever complain of any back problem. Significantly, he made no complaint of back pain upon his initial hospitalization after the accident. He made no complaint of back pain later when he was rehospital-ized on September 6, and he remained in the hospital at that time for at least six days.
“In compensation cases the burden of proof rests upon the plaintiff to prove a causal connection between a work-related accident and disability. In this case the Court feels that the plaintiff has failed to sustain by a preponderance of evidence any causal connection between his present complaints and the accident of August 6, 1969.” (Written Reasons for Judgment, Record, pp. 22-24)
Our review of the record satisfies us that the trial judge committed no manifest error in concluding that the plaintiff had failed to carry the requisite burden of proof in order to recover. Indeed, the preponderance of the medical testimony, as well as significant inconsistencies in plaintiff’s own testimony, lends credence to the conclusion that plaintiff’s complaints were exaggerated and unfounded.
Plaintiff offered the medical testimony of Dr. G. Gernon Brown, Jr., who testified by deposition. Dr. Brown saw plaintiff on October 17, 1969, and while Dr. Brown initially stated in his deposition that plaintiff’s symptoms might be attributable to an intervertebral disk or were compatible with nerve root irritation, possibly from a herniated intervertebral disk, Dr. Brown then changed this testimony and stated that the symptoms were compatible with nerve root irritation, probably attributable to a herniated intervertebral disk.[1] Dr. Brown did further testify that it would be unusual for a man not to have complaints referable to the low back or the lower extremities for a period in excess of two months following the alleged accident if he, indeed, sustained a herniated intervertebral disk in the accident.[2]
The only other medical testimony offered by plaintiff was that of Dr. Charles D. Leslie, a radiologist at Earl K. Long Memorial Hospital. His significant testimony is the following:
“Q Now, doctor, after reviewing these films and making a myelographic study, did you reach any impression as to this man’s physical condition ?
“A Of course my function is not to actually reach a conclusion as to his particular situation; my function is to interpret the radiological examination; and my impression is that this is an abnormal myelogram, that he does have a defect on his right side at the level of the interspace between the fourth and fifth lumbar verterbrae.
“Q And is this defect consistent with a herniated disk?
“A A herniated disk may project in this manner, may show in this manner, yes, sir.
“Q Doctor, in your experience would an abnormal defect such as this, would this result in any disability in the patient ?
“A Of course the defect in itself doesn’t result in any disability. The signifi- *776 canee of the defect, of course, may. This type of defect, as you suggested in a previous question, does this happen with disk herniation or disk protrusion, yes, this type of defect does occur with that situation and certainly disk protrusion may result in the patient having symptoms.
* * * * * *
“A My feeling was that it was an abnormal myelogram and my report indicates, I said it was consistent with disk herniation. When I said that, it indicates from my own way of reporting cases, and what-not, that I had additional information suggesting that this also correlated with what the referring physician had told me relative to the patient.” (Record; pp. 67, 76)
In opposition to the foregoing inconclusive medical evidence offered by plaintiff is the testimony of the various doctors who were called as witnesses by the defendants. Dr. James W. Lorio, the treating physician, summarized his conclusion that plaintiff sustained no disability following August 18, 1969:
“Q Doctor, insofar as any disability is concerned, throughout the period of your examinations and treatment of this patient did you at any time feel that he had any objective signs or indications of any disability to his low back or to his right lower extremity ?
“A None whatsoever.
“Q Did you feel that he had any disability of any kind which may have been related to his occupation or employment ?
“A During the period described for heat exhaustion, yes. Subsequent to that period—
“Q Subsequent to the heat exhaustion, that is, subsequent to August 18 of 1969?
“A None whatsoever.
Dr. Charles B. Cracraft examined plaintiff for the first time on May 19, 1970, at the request of defendants and again on December 1, 1970, at the request of counsel for plaintiff. Dr. Cracraft’s relevant testimony pertaining to these two examinations and his conclusions drawn therefrom are as follows:
“Q Did you conduct a physical or clinical examination, doctor?
“A Yes, sir.
“Q And what did that reveal?
“A The patient was a well developed and well nourished thirty-six year old male who walked with a slow gait but with no definite limp. He was carrying a stick for use as a cane but he did not appear to be using it. The stick was so short I thought it would do more harm than good if he needed it, he was having to bend over to reach it. He appeared in no acute distress. He undressed slowly but apparently had no pain in carrying out this function. Inspection of the back revealed no list or pelvic tilt. He would not try to bend either forward or backward or to the right and left more than fifty percent of normal because of pain. In the supine — in the sitting position the legs could be completely extended without causing pain but in the supine position he complained on attempts of straight-leg raising tests even with the knees flexed. Now this is not a consistent finding. There was no apparent loss of sensation at that time to touch on either leg. There was no weakness of dorsiflexion of either foot or either great toe. The legs were equal in length and the thighs and calves were equal in circumference when measured at corresponding levels. In the prone position he complained of tenderness to pressure even to light touch over the entire back. In one spot in the prone position when lightly touched he practically jumped off the table. I did *777 not feel that anyone in severe pain would be able to do this, in fact, they would try to be as still as possible if they were having severe pain. The reflexes were present and active bilaterally. I took x-rays in my office on 5/19/70 and these revealed no evidence of fracture or dislocation and there was no spondylolisthesis. The disk spaces were well preserved. It was my opinion that by history the patient probably had a strain and contusion of his low back which I felt was healed at the time. I felt that he tended to exaggerate his symptoms and that he could return to regular work without difficulty, however, I felt since litigation was pending it was doubtful he would return to any work until this was settled.
Q Doctor, then I take it as a result of your physical clinical examination at that time on May the 19th, 1970 that you found absolutely no objective manifestations indicative of low back injury or disability at that time, sir ?
A No, sir, other than the complaint of pain to touch, I mean no physical findings.
Q Right. Now, doctor, on December 1st, of 1970 did he give you any interim history at that time when you saw him or any additional interim history at that time?
‘A Yes, sir. He stated he was still having constant pain and it was aggravated by any activity. He said a myelogram was done at the Earl K. Long Charity Hospital and that he was to be hospitalized on the day that I saw him on 12/1/70 for surgery. My office contacted the hospital at that time and one of the secretaries told us she could find no record of a myelogram in his file at that time.
“Examination on the 1st of December revealed that the patient walked with a slow, shuffling gait but without a definite limp. He was again carrying the cane but did not appear to use it. He was wearing a back brace which he stated was prescribed by charity hospital. There was no list or pelvic tilt. The patient would not try to bend his back in any direction because of the complaint of pain. I could detect no muscle spasm. Again, in a sitting position the legs could be completely extended without causing pain. In the supine ■ position, even with the knees flexed, he complained of pain. There was no weakness on dorsiflexion of either foot or either great toe. The legs were equal in length and there was no atrophy of the thigh or calf musculature of either leg. In the prone position he complained of pain even to light touch over the entire low back. In fact, he complained of pain when I was testing him for his reflexes. The reflexes were present and active bilaterally.
“Q Doctor, as a result of that physical clinical examination did you find— were there any physical findings or objective manifestations indicative of any low back injury or disability, sir?
“A I could find no positive evidence of it.
“Q Then, sir, as a result of your, both of your physical clinical examinations, was it your opinion that as far as you were concerned there were no objective, there was no objective physical evidence or no objective signs which would prevent this man from returning to his usual and regular work as a laborer?
“A No objective findings, no, sir.” (Record, pp. 97-100)
Dr. William L. Fisher, Jr., a neurosurgeon, examined plaintiff on March 13, 1970. His significant testimony relative to this examination and his conclusions drawn therefrom are the following:
“A < * * * Examination reveals the patient to be a well developed, well *778 nourished, colored male, who is walking with the aid of a walking stick, however, it was noted that he uses the stick in his right hand and is complaining of right leg pain. It has been my observation that in order to favor a lower extremity, the cane is used in the hand opposite that lower extremity. The patient walks with a definite limp. He will not attempt to either walk on his heels or toes. Examination of his back reveals that the patient stands quite rigid and will move only a few degrees in any direction complaining of severe pain. Palpation anywhere about his low back causes the patient to jerk away from the examiner and complain of severe pain. When, however, one can get the patient to put his full weight on his left lower extremity and then his right lower extremity, it becomes rather obvious that the patient does not indeed have any type of para-vertebral muscle spasm. No atrophy of the pelvic girdle or lower extremities is noted. There is no strict weakness noted in the lower extremities to objective testing. Straight leg raising in the sitting position reveals that the patient does not complain of pain with the leg extended to a full ninety degrees. In the supine position the patient does not complain with straight leg raising of the left leg to ninety degrees, however, on the right leg he complains of severe low back and right posterior thigh pain at approximately forty degrees of extension. The patient also complains of severe posterior thigh pain with flexion of his knee on his chest on the right. Again, with the patient in — ’ And I might add that flexion of the knee is a maneuver to relax the nerve, not to put stretch on it. ‘Again, with the patient in the right and left lateral decubitus positions, it becomes obvious that he does not have any true muscle spasm of his low back as the para-vertebral musculature is quite relaxed. Sensory examination reveals that the patient has full sensation about his body with the exception of the right lower extremity and although he will withdraw from a rather vigorous pin prick, he claims he cannot feel the pin prick at all. It is also interesting to note that with the patient in the supine position with his eyes closed, that when asked to answer “yes” when he is touched and “no” when he is not touched, he answers appropriately “no” each time his right lower extremity is touched. It would appear that the patient is perceiving this sensation by carrying out the instructions of saying “no” when he is touched. The patient’s deep tendon reflexes are present and symmetrical throughout in his lower extremities. No pathological reflexes are elicited.
T would feel that from a strictly objective standpoint there is certainly no evidence to substantiate this patient’s subjective complaints of severe low back pain and right leg pain. Due to his rather bizarre responses to objective testing, particularly in the sensory area, it would give one cause to doubt some of his subjective complaints.
T would feel that this patient is, from an objective standpoint, not disabled.’ ” (Record, pp. 127-129)
Dr. Dean W. Geheber, a radiologist, was called by defendant to rebut the testimony of Dr. Leslie. Dr. Geheber confirmed that it was unfortunate that the needle used to inject the opaque dye in connection with the performance of the myelogram was placed in the fourth lumbar interspace, and further testified that the myelogram was not diagnostic of a herniated intervertebral disk.
The record also shows that plaintiff was involved in an automobile accident on February 5, 1971, when the vehicle in which he was sitting on the right front seat was struck on the right side, as a result of which plaintiff sought medical treatment at the emergency room of Earl K. Long Memorial Hospital. The record also shows that plaintiff was struck in the head by a brick *779 thrown by a member of his family on April 27, 1970, as a result of which plaintiff again sought medical treatment at Earl K. Long Memorial Hospital. Plaintiff at first denied sustaining any other injuries or having been involved in any other accidents subsequent to the accident sued on, and it was only after he was directly confronted with these two specific incidents that he reluctantly admitted their occurrence.
Finding no manifest error committed by the trial judge, we affirm the judgment dismissing plaintiff’s suit. Plaintiff is taxed with all costs of this appeal.
Affirmed.

. Compare pages 7 and 8 with page 10, deposition of Dr. G. Gernon Brown, Jr., Plaintiff Exhibit No. 1.

. Deposition of Dr. Brown, Plaintiff Exhibit 1, pages 15, 16.